UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE

BILLY RAY IRICK,                          )
                                          )
        *Petitioner,*                     )
v.                                        )       No.     3:98-cv-666
                                          )       *Chief Judge Curtis L. Collier*
RICKY BELL, WARDEN, Riverbend             )
Maximum Security Institution              )
                                          )
        *Respondent.*                     )

## **MEMORANDUM**

Billy Ray Irick ("Petitioner") is scheduled to be executed by the State of Tennessee on December 8, 2010 as a result of his November 1986 convictions for the murder and rape of a seven-year-old girl. He has exhausted his appeals in the Tennessee courts and his federal habeas corpus petition was denied (Court File No. 147).[1]

Petitioner's case is again before the Court on remand from the United States Court of Appeals for the Sixth Circuit to consider Petitioner's Rule 60(b) motion requesting relief from judgment (Court File Nos.159, 193). The Court granted Petitioner's Rule 60(b) request to consider the merits of several claims that were previously denied for failure to exhaust in the state courts (Court File Nos. 195, 200). Therefore, certain reopened claims originally brought in Petitioner's habeas corpus petition and amended petition are pending before this Court (Court File Nos. 57, 95). Also pending is Petitioner's motion to expand the record (Court File No. 207). The parties have submitted their briefs on those claims reopened as a result of the Rule 60(b) motion and the Court considers those claims below after disposing of the request to expand the record.

---

[1]     The facts of this case are recited in considerable detail in the Court's Memorandum and Order denying Petitioner's habeas corpus petition. Court File No. 146, pp. 1 - 21.

The Court has reviewed the pleadings and briefs filed by both parties, the record of Petitioner's underlying conviction, the entire record in this case, and the applicable law. For the following reasons, the court concludes Petitioner's pending claims lack merit; thus, habeas relief will be **DENIED** and this action will be **DISMISSED** (Court File No. 200).

## I.      NON-DISPOSITIVE MOTION

Petitioner has filed a motion requesting to expand the record with the report of Dr. Peter Brown, which has been previously submitted as an exhibit to his Motion to Reconsider (Court File No. 202) and the affidavit of Dr. Clifton R. Tennison, which has not been previously submitted in this Rule 60(b) proceeding (Court File No. 207). In addition, Petitioner has filed a supporting memorandum, wherein he requests the court to reconsider his actual innocence claim (Court File No. 208). For the reasons explained below, the motion will be **GRANTED IN PART** and **DENIED IN PART** (Court File No. 207).

As grounds for expanding the record with Dr. Brown's report, Petitioner contends it was one of the bases upon which he sought reconsideration of this Court's denial to reopen habeas proceedings as to his two ineffective assistance of counsel claims. Petitioner maintains the report could not have been obtained and submitted prior to counsel's decision in late 2009 to use his own personal funds to hire mental health experts, since previous attempts to obtain court funding during federal habeas proceedings were denied. Though Petitioner admits, without explanation, that he did not make Dr. Tennison's affidavit an exhibit to the motion to reconsider, he now requests that it be included as it "is material evidence of his actual innocence claim." (Court File No. 207).

Accordingly, the motion is **GRANTED** to the extent Dr. Tennison's affidavit will be included in the record, and **DENIED AS MOOT** to the extent that Dr. Brown's report is already

a part of the record (Court File No. 207). Additionally, reconsideration of Petitioner's actual innocence claim entitles him to no relief.

For the reasons explained below, even with the addition of Dr. Tennison's affidavit, Petitioner still has not met the "demanding" and "extraordinary" standard of the actual innocence test required to excuse his procedural default of his ineffective assistance of counsel claims. Specifically, Petitioner has not met the required standard enunciated in *Schlup v. Delo*, 513 U.S. 298 (1995) and examined in *House v.* Bell, 547 U.S. 518 (2006), as to his claim that he is actually innocent of the crimes. Under this test, actual innocence means factual innocence. Likewise, Petitioner has not met the actual innocence standard set forth in *Sawyer v. Whitley*, 505 U.S. 333 (1992) and examined in *Calderon v. Thompson*, 523 U.S. 538 (1998), as to this claim that he is actually innocent of the death sentence.

### A.    *Actually Innocent of the Crimes*

To satisfy the innocence exception, as to his convictions, the Supreme Court requires Petitioner to show that, in light of the new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327. Thus, the threshold inquiry is whether "those new facts raise[] sufficient doubt about [Petitioner's] guilt to undermine confidence in the result of the trial" *Id*. at 317. By "new evidence" the Court means "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id*. at 324. The Supreme Court has specifically instructed that "[t]he meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror could have found the defendant guilty." *Schlup*, 513 U.S. at 329. In addition, the

Court counseled that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

Petitioner claims he is actually innocent of committing the crimes based on his claimed insanity at the time of the crime. Petitioner, however, has presented no evidence that he was insane at the time he committed the crime.[2] Rather, he has submitted as evidence the opinion of Dr. Brown that in his opinion there is reason to question Petitioner's mental state and that in Dr. Brown's opinion Petitioner's sanity at the time of the offense could not be proven beyond a reasonable doubt. This opinion of Dr. Brown does raise some question regarding Petitioner's mental state at the time of the crime but it fails to demonstrate Petitioner was insane at the time he committed the crime.[3]

Dr. Tennison testified during the sentencing phase of Petitioner's criminal trial as a State witness. Dr. Tennison had a strong diagnostic impression that Petitioner suffered from an anti-social personality disorder, but because he was looking for major mental illnesses and not personality disorders, he did not pursue further testing. Dr. Tennison did identify and describe, however, the

---

[2]    To put this claim into perspective, some background information is necessary. Although trial counsel filed a notice to use the insanity defense, such notice was eventually withdrawn, presumably, to some extent, because Petitioner told trial counsel he was not going to plead insanity and because the evidence did not support such a defense (*Id*. at 16). Specifically, in addition to Dr. Tennison's report concluding Petitioner was not insane at the time of the crime, according to trial counsel, Petitioner's experts—a psychiatrist, a psychologist (Dr. Diana McCoy), and a neuropsychologist (Dr. Scariano)—concluded Petitioner was a sociopath (Court File No. 146, at 21). Therefore, counsel made the strategic choice to introduce the mental illness evidence in the guilt-innocence phase of trial, in an effort to save Petitioner's life, through Nina Braswell Lunn, a social worker who had met Petitioner and his parents when he was first referred to the Mental Health Center in Knoxville by the Knox County School psychologist (Addendum No. 3 (Vol. 3 of 4), at 996-1031). In addition, Dr. Tennison testified, albeit on behalf of the prosecution, that Petitioner suffered from a personality disorder (Addendum No. 3 (Vol. 3 of 4), at 1068-1088).

[3]    Dr. Brown states "[t]here is evidence of severe mental illness at the time of the offense and his sanity at the time cannot be established beyond a reasonable doubt." (Court File No. 207-1, at 2).

personality disorder traits—anti-social, schizoid, narcissistic, and histrionic—he found in Petitioner (Addendum No. 3 (3 of 4) at 1065-86).

Dr. Tennison now states "no confidence should be placed in Mr. Irick's 1985 evaluations of competency to stand trial and mental condition at the time of the alleged offense." Dr. Tennison says he was not aware of the information provided in affidavits obtained by habeas counsel in 1999 from the victim's relatives, i.e., Petitioner's auditory hallucinations, threats to kill others, poor self-care, overtly dangerous behaviors, paranoid delusional thinking, and significant conflict with others on the day he committed the crimes (Court File Nos. 129, 130). Had Dr. Tennison seen these affidavits or been advised of this information, he avers it "would have altered the course of the assessment, most likely resulting in a referral for inpatient completion of the court-ordered evaluation." (Court File No. 207-1, at 30). In addition, although Dr. Tennison refers to certain documents relating to evaluations of Petitioner between 1965 and 1967, which he avers he had not seen, but which, along with the information about Petitioner's actions prior to the crime, would have led him to recommend an inpatient evaluation, the record reflects Dr. Tennison was aware of some of Petitioner's prior psychological history before rendering his original opinion.[4] Nevertheless, Dr. Tennison does not say that his diagnosis or conclusions were incorrect or that Petitioner was insane at the time he committed the crime (Court File No. 207-1, at 29-32). Additionally, it does not appear that Dr. Tennison takes into consideration any of the other psychological evaluations performed on

---

[4]     During the sentencing phase of the trial Dr. Tennison testified on behalf of the State as a rebuttal witness. He explained that after he interviewed Petitioner, he looked at Dr. Dye's record which included some of Petitioner's prior records (Addendum 3 (Vol. 3 of 4) at 1067). Therefore, it appears Dr. Tennison had some knowledge of Petitioner's prior mental health history when he made his initial assessment, although the Court is unable to determine which records were included in Dr. Dye's file.

Petitioner subsequent to Dr. Tennison's assessment.

Remarkably, rather than have Dr. Tennison re-evaluate Petitioner to support his claim of insanity, counsel had Dr. Brown evaluate Petitioner who states "[t]here is evidence of severe mental illness and his sanity at the time cannot be established beyond a reasonable doubt."[5]   As explained below, this is insufficient to satisfy Petitioner's burden of proof.  This is not a case where the doctor who originally tested Petitioner finding him sane has now come forward and, based on previously undisclosed information, changed his diagnosis and concluded Petitioner was not sane at the time he committed the crime.  Rather, this is a case where the doctor is questioning his original diagnosis and states that he would have referred Petitioner for an inpatient evaluation had he possessed this other information.  In addition, because of changes and advances in behavioral health sciences since 1985, "and especially in light of this new information," Dr. Tennison states it is his "professional opinion to a reasonable degree of medical certainty that without further testing and evaluation, no confidence should be placed in Mr. Irick's 1985 evaluations of competency to stand trial and mental

---

[5]         Dr. Brown also states:

> [T]he weight of the available information indicates that Mr. Irick, more likely than not, lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform that conduct to the requirements of the law due to a severe mental illness.  It is more likely than not that he lacked substantial capacity to appreciate the wrongfulness of his acts.

> Neuropsychological testing and developmental history indicates that the claimant has severe deficits in his capacity to premeditate, appreciate, make judgments or conform his behavior.  It is more likely that not that these deficits have been present since childhood and have continued unchanged throughout his adult life.  Test results are approximately consistent with those of a 7-9-year-old-child.  His severe impairments would have existed continuously from childhood and have been present both at the time of he offense and at the time of his trial and are present now.

(Court File No. 207-1, at 2).

condition at the time of the alleged offense." (Court File No. 207-1, at 32). Petitioner has, however, been "further" tested and evaluated by Dr. Brown, but it does not appear that this information has been shared with Dr. Tennison. Nevertheless, Dr. Brown's evaluation along with Dr. Tennison's affidavit is simply insufficient to demonstrate it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.

Dr. Brown's evaluation is not sufficiently compelling and does not place this case into the class of extraordinary and rare cases qualifying under the actual innocence exception. "Because 'psychiatrists [and other mental health expert] disagree widely and frequently on what constitutes mental illness,' *Ake v. Oklahoma*, 470 U.s. 68, 81 . . . (1985), a defendant could, if [Petitioner's] argument were adopted, always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion." *Harris v. Vasquez*, 949 F.2d 1497, 1515 (9th Cir. 1990) (finding that the mere presentation of new psychological evaluations, based on the facts of the case, insufficient to state actual innocence claim), *cert. denied* 503 U.S. 910 (1992); *also see Griffin v. Johnson*, 350 F.3d 956, 965 (9th Cir. 2003) (mere presentation of new psychological evaluations, against factual background of case, failed to show actual innocence), *cert. denied*, 541 U.S. 998 (2004).[6]

This is exactly the situation confronting the Court in this case. Petitioner presents Dr. Brown, who, without explaining specifically what evidence he is relying upon to reach his conclusions, states *inter alia*, that "[t]here is evidence of severe mental illness at the time of the

---

[6] In this case Dr. Auble, who had all of Petitioner's prior psychiatric records and who also tested him, testified at Petitioner's state post-conviction trial that Dr. Tennison's diagnosis of marked antisocial, schizoid, narcissistic, and histrionic was consistent with her own diagnosis of a mixed personality disorder (Addendum No. 12, (Vol. 1 of 3), at 19). Dr. Auble did not testify, however, that Petitioner was insane at the time he committed the crime.

offense and his sanity at the time cannot be established beyond a reasonable doubt." (Court File No. 207-1, at 1). In addition, Dr. Brown does not explain how the "severe mental illness" mitigates the vaginal and anal rape, and murder of this seven-year-old female victim. The fact that Petitioner may have deficits in his capacity to make judgments and conform his behavior, as his skills are consistent with those of a 7-year to 9-year old child, does not demonstrate that those alleged shortcomings are due to an inability rather than an unwillingness to conform his behavior. This psychiatric evaluation, more than twenty years later, without more, does not present a sufficient showing of factual innocence.

This psychiatric evaluation is even less compelling when considered along with the psychiatric proof previously presented in this case. Not only were Petitioner's trial counsel aware of his mental health problems, it appears they had full access to his psychiatric records, and in fact, retained mental health experts who thoroughly evaluated Petitioner. Those experts did not, however, conclude Petitioner was insane at the time he committed the crime or suffered from a mental disease that would have mitigated his culpability; rather, they diagnosed Petitioner as a sociopath (Addendum 12 (Vol. 1 of 3), at 177-78). Similarly, Petitioner's post-conviction expert reached virtually the same conclusion that Dr. Tennison originally reached, i.e., that Petitioner suffered from a personality disorder rather than insanity.

When the Court considers the new evidence along with the complete record in this case, which includes evidence of Petitioner's mental health history; other psychological testing results from mental evaluations conducted during the trial and post-conviction phases of his criminal case;

his confession; and his behavior before, during, and after the crimes,[7] the record is inconsistent with the contention that he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. *Graham v. State*, 547 S.W. 2d 531 (Tenn. 1977) (adopting American Law Institute Model Penal Code for insanity). Dr. Brown's report and Dr. Tennison's affidavit considered with all of the other psychological information in the record does not demonstrate that with these two new pieces of evidence "it is more likely than not that no reasonable jury would have convicted" Petitioner. These records do not diagnose Petitioner as insane. There is no evidence before this Court of Petitioner's insanity; thus, Dr. Brown's evaluation and Dr. Tennison's affidavit do not raise sufficient doubt about Petitioner's guilt so as to undermine confidence in the result of the trial.

### B.      *Actually Innocent of Death Sentence*

To satisfy the innocence exception as to the death sentence, Petitioner "must show 'by clear and convincing evidence' that no reasonable juror would have sentenced him to death in light of the new evidence." *Calderon v. Thompson*, 523 U.S. at 559-560 (quoting *Sawyer v. Whitley*, 505 U.S. at 348). The Supreme Court further instructed "that the 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional

---

[7]        Petitioner spent the afternoon before the rape and murder with Mr. Jeffers and Darrell Easterly with no signs of insanity; Petitioner indicated he did not wish to baby sit the Jeffers children; after the murder Petitioner left the murder home and went next door to call Mr. Jeffers; after the telephone call Petitioner returned to the Jeffers' home and "kicked a bucket, kicked the dog, hit the porch post with his fist, and very loudly said, "d—." Before Mr. Jeffers and law enforcement officials could return to the home, Petitioner left the home and remained in hiding until approximately 5:00 p.m. the next day. (Court File No. 146, pp. 2-5). These actions are consistent with a consciousness of guilt and an understandable desire to avoid responsibility for his actions. Moreover, after being located by law enforcement officers, Petitioner gave a confession to the crimes.

mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." *Id.* at 347.

Although, arguably, Petitioner's new evidence demonstrates Dr. Tennison's lack of all his prior mental health evidence *might* have affected his diagnosis, and *might* have affected his testimony, and thus, being as charitable as possible to Petitioner, this *might* have affected the accuracy of his death sentence, such speculation heaped upon speculation is far from the clear and convincing evidence necessary to demonstrate that Petitioner is probably actually innocent of the sentence he received.[8] *See Duggar v. Adams*, 489 U.S. 401, 412, n.6 (1989) ("Demonstrating that an error is by its nature the kind of error that might have affected the accuracy of a death sentence is far from demonstrating that an individual defendant probably is 'actually innocent' of the sentence he or she received"). This is so, because Petitioner has not shown that Dr. Tennison's conclusions were inaccurate or that he was ineligible for the death penalty. At most, Petitioner has demonstrated

---

[8]     At Petitioner's trial, Dr. Tennison testified he found no evidence demonstrating Petitioner suffered from any mental illness or mental defect that prevented him from appreciating the wrongfulness of his conduct. Then he explained:

> We look very closely to see if there is any evidence for a psychotic disorder, which means a loss of touch with reality in one way or another; or affective disorder, which means a mood or emotional disease or disorder; and other kinds of severe anxiety or dissociative disorders, which include amnesias and that sort of thing. We, also, look for any medical illness– for something that would interfere with the person's ability to think clearly or use their emotions in a proper, appropriate way. So we tend to try to find any evidence for something being wrong. And both of us, after our exams of Mr. Irick, were unable to come to that conclusion; that there was nay reason to send him for on for further evaluation. We couldn't find any medical or psychiatric evidence to support incompetence to stand trial or reason to support an insanity defense.

(Addendum 3 (Vol. 3 of 4), at 1068-69. When asked whether Petitioner suffered from any disease or defect at all, Dr. Tennison explained that he had a strong diagnostic impression, though it was not a scientifically-drawn diagnosis, that Petitioner suffered from an anti-social personality disorder (*Id.* at 1069).

that an error *might* have affected the accuracy of his death sentence. Petitioner has not demonstrated he "probably is 'actually innocent'' of the sentence." *Id.* Moreover, this evidence does not relate to the aggravating factors found by the jury that made Petitioner eligible for the death penalty.[9] Thus, even if this evidence had been before the jury, not only can it not be said that a reasonable juror would not have found all four of the aggravating factors that made Petitioner eligible for the death penalty, *Sawyer v. Whitley*, 505 U.S. at 348-49, the evidence does not demonstrate no reasonable juror would have found Petitioner eligible for the death penalty. *Id.* at 338-39.

## C.    *Conclusion*

In summary, "to the extent a capital petitioner claims he did not kill the victim, the *Schlup* 'more likely than not' standard applies. To the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, the *Sawyer* 'clear and convincing' standard applies . . ." *Calderon v. Thompson*, 523 U.S. at 560; *Williams v. Bagley*, 380 F.3d 932 (6th Cir. 2004), *cert. denied* 544 U.S. 1003 (2005) ("To establish his 'innocence' of the death penalty, a petitioner must 'show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."(quoting *Sawyer v. Whitley*, 505 U.S. at 336)). In light of the record in this case, including the psychological evidence presented at trial and in the state post-conviction proceedings; Petitioner's confession of the crimes; and Petitioner's actions before, during, and after

---

[9]    The four aggravating circumstances found by the jury to justify imposition of the death penalty are: (1) the victim was less than 12 years of age and the defendant was 18 or older; (2) the murder was committed while the defendant was engaged in committing the felony rape; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution (Addendum No. 13, at 2, 11-24).

commission of the crimes, the presentation of this evidence more than twenty years later, does not sufficiently present a claim of factual innocence of the crime or a claim of being actually innocent of the death penalty.

Accordingly, the Court is unable to conclude no reasonable juror would have convicted Petitioner of felony-murder and rape beyond a reasonable doubt, or sentenced him to death in light of the new evidence.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted in the Criminal Court of Knox County, Tennessee of one count of first-degree felony murder and two counts of aggravated rape by vaginal and anal penetration of a seven-year old girl. Petitioner was sentenced to death for the first-degree murder and forty years as a Range II especially aggravated offender on each charge of aggravated rape, to be served concurrently with each other and consecutively to the sentence imposed for murder.

Petitioner's convictions and sentences were affirmed on direct appeal, *State v. Irick*, 762 S.W.2d 121 (Tenn. 1988), *cert. denied*, 489 U.S. 1072 (1989), and he was subsequently denied State post-conviction relief, *Irick v. State*, 973 S.W.2d 643 (Tenn. Crim. App.), *perm. appeal denied* (June 15, 1998), *cert, denied*, 525 U.S. 895 (1998). Petitioner then filed a federal habeas corpus petition; this Court denied relief; and the Sixth Circuit affirmed this Court's decision. *Irick v. Bell*, 565 F.3d 315 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 1504 (2010).

Among the claims raised in the federal habeas corpus petition were the following:(1) the use of the felony murder aggravating circumstance was not harmless error; (2)  the flight instruction impermissibly shifted the burden of proof to Petitioner; (3) a challenge to the prejudice/sympathy jury instruction, the weighing instruction, and the trial court's failure to instruct the jury it was the

sole judge of the facts and law; (4) trial counsel were ineffective for failing to fully investigate, develop, and present a mental health defense at the guilt phase and as a mitigating factor at the sentencing phase; and (5) claims under *Brady v. Maryland*, 373 U.S. 83 (1963), i.e., the State improperly withheld police reports relative to Petitioner's intoxication on the night of the crime and to the victim's fear of her step-father; as well as notes from a phone conversation with Petitioner's mother reflecting he drank from the commode and was evicted from a Sevierville Home because he was "in [the] girls room" (Court File No. 201-1, at 40). In granting Respondent's motion for summary judgment, the Court determined all these claims were procedurally defaulted, and, alternatively, that several claims lacked merit.

Petitioner subsequently filed a Rule 60(b) motion, relying on the then newly promulgated Rule 39 of the Rules of the Supreme Court of Tennessee, which changed the landscape regarding the exhaustion of state remedies for claims raised in federal habeas petitions. Rule 39 of the Rules of the Supreme Court of Tennessee provides:

> In all appeals from criminal convictions or post-conviction relief matters from and after July 1, 1967, a litigant shall not be required to petition for rehearing or to file an application for permission to appeal to the Supreme Court of Tennessee following an adverse decision of the Court of Criminal Appeals in order to be deemed to have exhausted all available state remedies respecting a claim of error. Rather, when the claim has been presented to the Court of Criminal Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies available for that claim. On automatic review of capital cases by the Supreme Court pursuant to Tennessee Code Annotated, § 39-13-206, a claim presented to the Court of Criminal Appeals shall be considered exhausted even when such claim is not renewed in the Supreme Court on automatic review.

In his Rule 60(b) motion, Petitioner raised the above-identified claims, arguing those claims were no longer procedurally barred from habeas review, due to the retroactive state supreme court

rule.

The Court transferred Petitioner's Rule 60 motion to the Sixth Circuit under the then-applicable case law requiring that it be treated as a second or successive federal habeas corpus petition under *McQueen v. Scroggy*, 99 F.3d 1302, 1335 (6th Cir. 1996). However, "[b]ecause *McQueen* is no longer applicable, *see Gonzales v. Crosby*, 545 U.S. 524 (2005), [and] the district court is no longer required to transfer" Rule 60(b) motions to the appellate court, the Sixth Circuit remanded the motion to this Court to proceed to rule on this motion in the first instance (Court File No. 193).

When the Court recently ruled on Petitioner's motion to grant his 60(b) motion, reopen his habeas proceeding, permit him to amend his Rule 60(b) motion, and submit an additional brief and authorities, the Court concluded, *inter alia*, that the initial procedural default ruling as to the two ineffective assistance of counsel claims was correct and relief is not warranted because Petitioner omitted those claims from an appeal to the Tennessee Court of Criminal Appeals before subsequently raising them in the Tennessee Supreme Court, and the promulgation of Tennessee Supreme Court Rule 39 offered no relief in this instance (Court File No. 195). Petitioner subsequently filed a motion for reconsideration (Court File No. 202) which Respondent opposed (Court File No. 203), and which the Court subsequently denied (Court File No. 206).

This Court, however, granted Petitioner's Rule 60(b) request to consider the merits of the other claims that were previously denied for failure to exhaust. The parties have submitted their briefs on the reopened claims and the Court considers those claims below.

## III.    RULE 60(B) MOTION STANDARD

"[A] Rule 60(b) motion that seeks to revisit the federal court's denial on the merits of a claim

for relief should be treated as a successive habeas petition." *Gonzalez v. Crosby*, 545 U.S. 524, 534 (2005). "Rule 60(b) does not allow a defeated litigant a second chance to convince the court to rule in his or her favor by presenting new explanations, legal theories, or proof." *Jink v. AlliedSignal, Inc.,* 250 F.3d 381, 384 (6th Cir. 2001). A Rule 60(b) motion that "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceeding[,]" is not to be treated as a second or successive habeas petition as it is a proper Rule 60(b) motion. *Gonzalez v. Crosby*, 545 U.S. at 532. Thus, in those instances in which the factual predicate of a petitioner's Rule 60(b) motion attacks the manner in which the earlier habeas judgment was procured and not the underlying conviction, i.e., how the previous habeas case was found by the court to be either procedurally defaulted or time-barred, the Rule 60(b) motion may be adjudicated on the merits. *Id.* Thus, a Rule 60(b) motion is not a vehicle for rearguing the merits of a claim that was dismissed on procedural grounds and alternatively dismissed on the merits. *Id.* at 532-34. Nor is it a proper vehicle for attempting to add a new ground for relief. *Id*. at 532.

## IV.     DISCUSSION

### A.         *Felony Murder Aggravating Circumstance*

In his habeas petition, Petitioner claimed the State violated his constitutional rights by the utilization of the felony murder aggravating circumstance. Specifically, Petitioner claimed the use of the felony murder circumstance was unconstitutional because it duplicated an element of the crime; thus, it failed to narrow the class of persons eligible for the death penalty as constitutionally required. Further, Petitioner claimed the state court incorrectly concluded the use of the felony aggravator was harmless error.

This Court denied habeas relief, determining Petitioner failed to challenge the harmless error analysis of the use of the felony-murder aggravator on federal constitutional grounds when he pleaded his claim before the state's highest court, that this failure amounted to a procedural default, and that Petitioner had failed to show cause and prejudice to excuse his procedural default. The Court also reached the following alternative conclusions on the merits: (1) the trial court used the correct harmless error analysis, and (2) the Constitution does not prohibit the use of the same factor to determine whether a murderer is eligible to receive the death penalty and whether there is an aggravating circumstance justifying the imposition of the death penalty. Petitioner now claims in his motion for relief from judgment that, pursuant to Tennessee Supreme Court Rule 39, he has not defaulted this claim. Although the Court has already resolved this claim on the merits and although Petitioner concedes as much, he further claims that, aside from any procedural default issue, he should prevail on the merits but offers no developed argument or supporting authority to show why this is so (Court File No. 192-1, 200, 201). Nevertheless, a Rule 60(b) motion cannot serve as a vehicle to reargue the previous merits determination.

Respondent contends the Court may not revisit this previously-resolved claim and, if it could reconsider the claim, the Court's previous determination was correct. The Court agrees with Respondent on both positions.

As previously explained, the state court conducted an harmless error analysis pursuant to the Tennessee Supreme Court case, *State v. Howell*, 868 S.W.2d 238 (Tenn. 1993), a case adopting the harmless error standard in *Stringer v. Black*, 503 U.S. 222 (1992). *See Irick v. State*, 973 S.W.2d 643, 658-59 (Tenn. Crim. App. 1998). Not only is the state court's harmless error analysis in compliance with constitutional requirements, but, as the Court also found, Petitioner failed to allege

a constitutional violation in the first place. *See Lowenfield v. Phelps*, 484 U.S. 231 (1988) (holding a death sentence based on the sole aggravating circumstance that is identical to an element of the underlying offense of first degree murder is not invalid); *see also Coe v. Bell*, 161 F.3d 320, 350 (6th Cir. 1998) (finding Tennessee's felony murder factor "can function as a proper and permissible narrowing factor at the eligibility stage" and relying upon *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990), also concluded it was proper to rely upon the felony murder factor as an aggravating circumstance). In this case the jury found Petitioner guilty of first degree murder based upon proof that while committing the felony of rape, he committed the murder. The fact the jury also found as an aggravating circumstance the murder was committed while Petitioner was engaged in committing the felony of rape does not render the death sentence invalid.

Accordingly, the state court's rejection of Petitioner's felony aggravator claim was not contrary to or an unreasonable application of clearly established federal law. No writ will issue as to this claim.


**B.      *Flight Instruction* (Petitioner's Claim 15(h) (Court File Nos. 57, 95)**

Petitioner asserts the flight instruction given at trial violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it was not supported by sufficient evidence and because it unconstitutionally shifted the burden of proof to him (Court File Nos. 57, 95).[10] More specifically, Petitioner contends there was little or no

---

[10]      The challenged jury instruction in this case regarding flight stated:

"If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by defendants may be caused by a consciousness of guilt, you may consider the fact of flight, if flight

evidence of flight, as he called the victim's step-father, told him something was wrong with the victim, waited for his arrival, and attempted to accompany the step-father and victim to the hospital (Court File Nos. 57, 95, Claim 15(h)).

Respondent argues this claim is also procedurally barred from habeas review since Petitioner failed to challenge the flight instruction on direct appeal, and only raised it in the context of an ineffective assistance of counsel claim (i.e., counsel was ineffective for failing to object to the trial court's instruction on flight) at the state post-conviction proceedings. *Irick v. State*, 973 S.W.2d at 653-54. Respondent is correct; this claim was never raised in the state courts except as a predicate of an ineffective assistance of counsel claim. It therefore is barred from habeas review.

Although the Court previously rejected this claim as procedurally defaulted, it alternatively rejected the claim on the merits (Court File No. 146, ¶. 131-32). More specifically, the Court concluded it is not improper to give a flight instruction when a defendant leaves the crime scene within a reasonably short period after the crime was committed, as Petitioner did in this case. *United States v. Rowan*, 518 F.2d 685 (6th Cir.), *cert. denied*, 423 U.S. 949 (1975). In addition, the Court concluded the evidence of flight was relevant and admissible, and the instruction forbade the placing of excessive reliance on flight as evidence of guilt and gave the jury the responsibility of deciding what weight to attach to Petitioner's leaving the scene and hitchhiking away; thus, there was no burden-shifting. *See Wong Sun v. United States*, 371 U.S. 471, 483 n. 10 (1963).

---

is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight <u>may be explained by proof</u> offered or by the facts and circumstances proved in the case. Whether there was flight by the defendant, the reason for it, and the weight to be given to it are questions for you to determine."

[Addendum No. 3, Vol. X, at 972].

As a general rule, errors in jury instructions in state criminal trials are not reviewable in federal habeas proceedings, "unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law." *Long v. Smith*, 663 F.2d 18, 23 (6th Cir. 1981) (citing *Henderson v. Kibbe*, 431 U.S. 145 (1977). The *Henderson* Court stressed "[t]he question in such a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" 431 U.S. at 154 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Furthermore, the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Therefore, as the Court previously determined, regardless of any procedural default, the claim lacks merit. Undoubtedly, there are sufficient facts on the record to justify the giving of the flight instruction. Evidence existed to support an inference that Petitioner fled. Petitioner was babysitting the victim and her siblings. Once he was unable to revive the victim, he called her step-father and told a neighbor it was too late to call an ambulance to help her. The victim's step-father left Petitioner with the victim's siblings when he took the victim to the hospital around midnight. Soon thereafter, a neighbor observed Petitioner putting on a jacket from the house, walking down the steps, and leaving the scene. Law enforcement left the hospital for the victim's house shortly after 1:15 a.m. to question Petitioner. When they arrived, Petitioner was gone and the children were home alone. The next day, April 16, 1985, at approximately 5:00 p.m. law enforcement observed Petitioner hitchhiking and arrested him (Court File No. 146, ¶. 3-5); *Irick v. State*, 973 S.W.2d at 654.

Accordingly, because this habeas claim was not fairly presented to the state courts for

consideration, it has been procedurally defaulted, and absent a showing of cause and prejudice, Petitioner's procedural default forecloses habeas review by this Court. Alternatively, Petitioner is not entitled to habeas relief as the flight instruction was proper and constitutional.

### C. *Jury Instructions* **(Petitioner's Claim 15(I))**

Petitioner challenges the state trial court's guilt phase instruction directing the jury not to have prejudice or sympathy; that the sentence shall be death if the aggravating circumstances outweigh the mitigating circumstances ("weighing instruction"); and the trial court's failure to instruct the jurors they were the sole judges of not only the facts but the law (Court File Nos. 57, 95, Claim 15(I)).

Respondent argues the Court's previous merits determination on the "prejudice or sympathy" aspect of this claim is correct and not subject to attack by the way of Rule 60(b) motion and the remainder of the claim (i.e., weighing instruction, omission of "sole judges" instruction) has been procedurally defaulted or is otherwise meritless (Court File No. 204).

The Court adheres to its previous ruling of procedural default. Petitioner raised a general claim on direct appeal that the Court's charge to the jury was improper because it failed to use the Tennessee Supreme Court's suggested form but only specifically challenged the failure to give the proper definition of torture and the failure to include certain mitigating circumstances (Addendum No. 4, at 23). In his amended habeas corpus petition, Petitioner denied his procedural default and argued the State was put on notice by the analogous state constitutional issue raised in his post-conviction appeal (Court File No. 95, at 26). However, these arguments are specious: Petitioner did not raise the "sole judges" instruction as a trial court error, but instead an attorney error. *Irick v. State*, 973 S.W.2d at 651-52. An attack on a jury instruction is not the same thing as an attack on

counsel's representation. Petitioner did not raise the weighing and prejudice or sympathy instructions in state court. Accordingly, the jury instruction claim, as to all three aspects, is procedurally defaulted and barred from habeas review. But even if it were not, it does not entitle Petitioner to any habeas relief for the reasons explained below.

### 1.       "Prejudice or Sympathy" Jury Instruction

The trial court instructed the jury it was to have no prejudice or sympathy and that nothing but the law and evidence was to have any influence upon its verdict. The jury was further instructed to render the verdict with absolute fairness and impartiality, considering only truth and justice, as much as was humanly possible. The jury was instructed it could find the defendant not guilty under any or all of the counts of the indictment. (Court File No. 146, at 133).

As the Court previously concluded when it granted Respondent's motion for summary judgment, such an instruction has been determined to be constitutional by the Sixth Circuit in *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), *cert denied*, 531 U.S. 1082 (2001), when it concluded that a challenge to a jury instruction that the jury must not be motivated by feelings of sympathy but must render a fair and impartial verdict was "utterly without merit, as such an instruction is a perfectly appropriate and indeed wise one." *Id*. at 528. This conclusion is reinforced by the Sixth Circuit's more recent opinion in *Beuke v. Houk*, 537 F.3d 618 (6th Cir. 2008) (found instruction that jurors "must not be influenced . . . by any consideration of sympathy or prejudice" was constitutional based on *California v. Brown*, 479 U.S. 538 (1987)). Specifically, the Sixth Circuit concluded that a review of the sympathy or prejudice instruction, when considered in the context of the entire instruction, simply focused the jury on considering only those matters entered as evidence, and therefore, did not violate the petitioner's constitutional rights. *Id*. at 651 Accordingly,

relief is not warranted here.

 2.  *The Weighing Instruction*

Next, Petitioner claims the trial court violated his constitutional rights by instructing the jury that "[i]f the jury unanimously determines that, at least, one or more aggravating circumstances have been proved beyond a reasonable doubt, and that said aggravating circumstance or circumstances are not outweighed by an mitigating circumstances, the sentence shall be death." (Court File No. 57, at 54).

As previously stated, when a jury instruction is challenged, the sole question on habeas is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  In *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), the Supreme Court concluded the Pennsylvania death penalty statute was not impermissibly mandatory because death was not automatically imposed upon conviction for certain types of murder, but rather, "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." *Id.* at 305.  In *Blystone*, at sentencing, the jury found one aggravating circumstance present—the petitioner committed a killing while in the perpetration of a robbery—and no mitigating circumstances.  The Court concluded "[t]he presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstance be further refined or weighed by a jury." *Id.* at 307-08; *see also Boyde v. California*, 494 U.S. 370 (1990) (finding no constitutional requirement that jury must have unfettered sentencing discretion and approving an instruction that a jury "shall"

impose death if it finds aggravating circumstances outweigh mitigating circumstances).

More recently, the Supreme Court approved the Kansas death penalty statue, a statute similar to the Tennessee statute, finding it met Constitutional muster. *Kansas v. Marsh*, 548 U.S. 163, 173 (2006) (concluding a death penalty statute that "direct[s] imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the aggravating circumstances and mitigating circumstances are in equipoise[,]" is consistent with the Constitution).

The Tennessee death penalty statute allows each individual juror to determine the existence of mitigating factors and aggravating factors and the weight to attribute to each factor. The Sixth Circuit has concluded such an instruction is proper. *Byrd v. Collins,* 209 F.3d at 527 (finding a challenge to the jury instruction "that if the aggravating circumstance outweighed the mitigating factors then a recommendation of death was mandatory[,]" was without merit); *see also Workman v. Bell*, 178 F.3d 759, 778 (6th Cir. 1998) (holding Tennessee's death penalty scheme constitutionally sufficient).

Accordingly, because the challenged instruction passes constitutional muster and because Petitioner points to no Supreme Court case which holds to the contrary, habeas relief is not warranted with respect to this alleged error.

### 3. Failure to Instruct Jury it was the Sole Judge of Facts and Law

Petitioner challenges the state trial court's failure to instruct the members of the jury they were the sole judges of the facts and law.

In cases where a petitioner claims the failure to give an instruction violated due process, his burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to

be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. at 155. The fact no instruction was given does not offend the Constitution because there is no clearly established federal law that requires a state trial court to give this instruction and because there is no such requirement under state law. As the state court held in addressing the instruction when raised as an attorney error: "[T]he record reflects that the jury was sufficiently and accurately charged as to the applicable law, and we cannot conclude that the Petitioner was prejudiced by the omission." *Irick v. State*, 973 S.W.2d at 652. Thus, the failure to give the requested instruction did not "so infect the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. at 72.

Accordingly, habeas relief is not warranted, and this claim will be **DISMISSED**.

### D.    Brady Claim

In this claim Petitioner contends the state illegally suppressed material exculpatory and mitigating evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), during his criminal trial. Specifically, in section (l) of the *Brady* claim, Petitioner contends he was denied the Knoxville Police Department's report indicating he was left to care for the children in a "drunken" state; statements of the victim's siblings indicating he was drinking heavily that night; and evidence the Jeffers' back porch was covered with beer cans, perhaps a case or more. In section (m), Petitioner claims the prosecution suppressed notes in the District Attorney's file indicating the victim was afraid of her step-father and notes memorializing a phone conversation in which Mrs. Irick said Petitioner drank from the commode and vaguely referenced his relationship with his sister and others.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of

the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87. The duty on the prosecution to disclose favorable evidence extends to impeachment evidence, or evidence affecting the credibility of a witness whose reliability may be determinative of guilt or innocence. *United States v. Bagley*, 473 U.S. at 682. When determining whether evidence is material the question is "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."" *Kyles v. Whitley*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. at 678).

### 1. Procedural Default

Petitioner contends the state court's decision on his *Brady* claim finding he failed to show the documents (which did not include the documents at issue here) were suppressed by the prosecution and that they were material, was based on an unreasonable determination of the facts in light of the evidence. However, a review of the appellate state court's post-conviction record does not reflect the documents at issue here were ever presented to or considered by any state court. *See Irick v. State*, 973 S.W.2d 643, 655-58 (Tenn. Crim. App. 1998).[11] Thus, the Court is perplexed by Petitioner's claim that the state court decision was based on an unreasonable determination of the facts in light of the evidence.

Respondent argues Petitioner failed to present this claim to the State's intermediate appellate court. Specifically, Respondent explains Petitioner offered a one and a half page argument

---

[11] In denying relief on Petitioner's *Brady* claim pertaining to other documents, some of which were challenges to unbriefed evidence, the Sixth Circuit "assum[ed] *arguendo*" that the evidence was favorable and suppressed but concluded "the state court decision that [Petitioner] was not prejudiced by its suppression was not contrary to or an unreasonable application of federal law." *Irick v. Bell*, 565 F.3d 315, 321 (6th Cir. 2009).

concerning *Brady* in his post-conviction appellate brief but the argument did not specifically address any evidence of Petitioner's drinking. In addition, Petitioner incorporated by reference an "itemized listing of those items of information . . . found in the petitioner's amendment dated January 19, 1993." Other than the reference to Kathy Jeffers saying Petitioner was well on his way to being intoxicated when she left for work that evening—a claim which has been resolved on the merits by the Sixth Circuit—the amendment includes no reference to the documents Petitioner now requests the Court to consider. Thus, argues Respondent, because Petitioner concedes his post-conviction counsel possessed the documents he now wishes this Court to consider and because he has not established cause for failing to present them in the state court post-conviction proceedings, the claim is procedurally defaulted and the promulgation of Tenn. Sup. Ct. R. 39 does not save it.

Petitioner counters, however, that the *Brady* claims are not procedurally barred because the relevant subject matter was sufficiently raised by referring the state appellate court to his amended state post-conviction petition which included: (1) the statement of the victim's mother saying Petitioner was well on his way to being intoxicated and (2) the question in the letter of the victim's mother inquiring as to why her husband took the Petitioner to buy beer and then brought him to her house while he was drinking. Petitioner also argues he assumes the Court permitted him to supplement the record with these documents because they did not fundamentally alter the legal claim already considered by the state court (Court File No. 205, at 3).

The Court's order permitting the expansion of the record made no such finding but rather noted "[t]he motion to expand the record includes documents that *appear* to be relevant to these issues." (Court File No. 128) (emphasis added). Petitioner did not bring these documents to the attention of the state court though he could have since state post-conviction counsel possessed the

documents.  Thus, initially, it appears this habeas court is barred from considering these documents absent proof of cause and prejudice, something which Petitioner has not attempted to demonstrate.

Petitioner also argues, however, the *Brady* claims are not procedurally defaulted because the relevant subject matter was raised in items 3 and 19(d) of his amendment to his state post-conviction petition and because these "new" factual allegations do not render the claim unexhausted because these new factual allegations do not "fundamentally alter the legal claim already considered by the state courts."[12]  Petitioner relies upon *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986), to support his claim that his evidence does not fundamentally change the claim already considered by the state court.

A review of the record indicates these specific documents were not submitted in the state court or identified in Petitioner's state post-conviction petitions or briefs; thus they were not addressed by Tennessee's intermediate appellate court or its supreme court.  Moreover, there is no evidence persuading this Court these documents were suppressed by the prosecution as there is no evidence before the Court demonstrating trial counsel were not aware of these documents. However, because there were two items referencing Petitioner's drinking before the state courts, and the Sixth Circuit concluded the Tennessee Court of Criminal Appeals rejected Petitioner's *Brady* challenge to the other statements regarding the drinking, the Court will analyze the alleged *Brady* violation, but only with respect to Petitioner's drinking on the day he committed the crimes.

As to the information contained in section (l) of the *Brady* claim, i.e., the note that the victim

---

[12]     Item 3 was a statement that "Billy Irick was well on his way to being intoxicated according to Kathy Jeffers when she left for work that evening." Item 19(d) was a question which the victim's mother wrote in a letter to the Knox County Attorney General's Office asking: "Why did Kenny leave Bill there knowing I already had a babysitter?"(Addendum Nos. 11-12, at 172-76).

was afraid of her step-father and notes regarding Petitioner drinking from the commode and his relationship with his sister and others, it appears the former note is related to the issue of the step-father's culpability, which was raised in the state post-conviction appellate court, but it does not appear a *Brady* issue relating to the suppression of the latter information regarding Petitioner's childhood events was ever raised in the state courts. Nevertheless, even if the claims are not procedurally barred, the Court is not persuaded Petitioner is entitled to have these claims reviewed because he has failed to demonstrate these documents were suppressed by the State. Petitioner has not submitted any affidavits, testimony, or any other evidence demonstrating trial counsel were not aware of this police report or these statements. Accordingly, there is absolutely no proof before this Court that this information was suppressed.

Nevertheless, assuming, but not finding, that these claims are not procedurally barred by procedural default and the prosecution suppressed these items,[13] Petitioner would not be entitled to any relief because, as explained below, his *Brady* claims lack merit.

> 2. *Knoxville Police Department Report; Statements of the Victim's Siblings; and Beer Cans on Porch*

Petitioner argues the report "that a 'drunken' Irick was left to care for the children, notes regarding beer cans on the victim's porch, and statements of the victims's siblings [which] also indicate that Irick was drinking heavily that night," (Court File No. 57) are favorable to Petitioner and are material because they demonstrate he was intoxicated, which he contends "resulted in settled insanity." (Court File No. 201). In support of this "settled insanity" defense, Petitioner directs the

---

[13] Petitioner has not directed the Court's attention to any evidence demonstrating trial counsel did not have the information identified in section (l) and (m) of his *Brady* claim. Although Petitioner cites to his state post-conviction appeal, there is nothing in that record demonstrating trial counsel was not aware of the evidence at issue here.

Court's attention to Dr. Peter Brown's report, wherein it notes Petitioner reported he  was consuming marijuana and alcohol at or around the time of the offense (Court File No. 205, at 3).

Respondent counters, *inter alia*, that "Irick's claim additionally fails for want of materiality for much the same reasons already expressed by [the Sixth Circuit] regarding Ms. Jeffers' statement that Irick was 'drunk and talking crazy' on the night of the murder." (Court File No. 204, at 15). Specifically Respondent argues additional evidence of intoxication offers Petitioner no relief as voluntary intoxication is not a defense to a general intent crime in Tennessee, and the underlying felony of aggravated rape, is a general intent crime.  Respondent also acknowledges "drunkenness" resulting in "settled insanity" can amount to a defense, *Walden v. State*, 156 S.W.2d 385, 387 (Tenn. 1941), but argues "settled insanity" is permanent insanity produced by long-continued habits of intoxication, *see Atkins v. State*, 105 S.W. 353, 360 (Tenn. 1907), something which Petitioner has not demonstrated.

Because the Court has assumed, for the sake of discussion, the evidence, which is arguably favorable, was suppressed by the State, the remaining discussion will be limited to the materiality prong of the *Brady* analysis, i.e., whether Petitioner is able to demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whiteley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  Petitioner contends "the state court's decisions below were based on an unreasonable determination of the facts in light of the evidence[,]" (Court file No. 201, at 3), yet he also contends this claim must be reviewed *de novo* because the "materiality of the intoxication which 'resulted in settled insanity' . . . has not previously been fully recognized or appreciated" (Court File No. 201, at 4).  The Sixth Circuit conducted a modified-AEDPA review when rejecting Petitioner's

*Brady* challenge to Ms. Jeffers' statement to law enforcement that Petitioner was "drunk and acting crazy" on the evening of the crime. Nevertheless, under either a modified-AEDPA review or *de novo* review, the Court's conclusion is the same.

a.    *Negate Intent at Trial*

Petitioner contends the Knoxville Police Department Report indicating "a drunken Irick" was left to watch the kids, notes regarding empty beer cans on the victim's porch and in the nearby vicinity, and the statements of the victim's siblings that Petitioner was drinking beer on the night of the crime were material, thus the suppression of those documents amounted to a *Brady* violation.

The Knoxville Police Department Report reflects the victim's stepfather, Kenneth Michael Jeffers, told law enforcement Petitioner was drinking beer during the morning hours of the day on which the crime occurred and that evening when he dropped Petitioner off at the house to babysit. Mr. Jeffers left Petitioner on the back porch drinking beer. Although it is not clear whether it is the officer's opinion or whether a witness told the officer, the report includes a statement that "Kathy Jeffers left a drunken Irick to watch the kids" (Court File No. 201-1, at 4).

The older brother of the victim, who attended special education classes, said Petitioner drank two packs of beer but he did not know whether he was drunk. The victim's eight-year old brother, who was in second grade, said Petitioner was drinking a lot of beer (Court File No. 201-1, at 27, 33). In addition, there are notes stating "several beer cans on back porch, 12-25 cans scatter (sic) about; 2 or 3 walking distance; some looked like they had been there several days." (Court File No. 201-1, at 38).

The Sixth Circuit addressed a *Brady* claim when Petitioner appealed the denial of his federal

habeas petition regarding the suppression of Mrs. Jeffers statement that Petitioner "was drunk and talking crazy." *Irick v. Bell*, 565 F.3d at 320.  Without explanation, Petitioner contends the Sixth Circuit's interpretations of federal and Tennessee law are in error.  If they are, that is not a matter which *this* court can address.  *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (2009) ("It is clear when a case has been remanded, the trial court must upon remand proceed in accordance with the mandate and the law of the case as established by the appellate court").

The Sixth Circuit concluded the Petitioner's intoxication could not have negated his intent to rape.  Specifically the Sixth Circuit explained:

> Under Tennessee law, evidence of intoxication may be admitted to negate the intent required in committing the felony underlying a felony murder charge. Voluntary intoxication is never a justification for a crime but its existence may negate a finding of *specific* intent.  Prior to Tennessee' adoption of the Criminal Sentencing Reform Act of 1989, the offense of aggravated rape was a general intent crime, for which a culpable mental state was necessary, but easily inferable from the conduct which comprises the offense.  The statute under which Irick was convicted, Tenn. Code Ann. § 39-2-603 (1979), defined aggravated rape as the unlawful sexual penetration of another accomplished under certain circumstances—in this case, the penetration of a child less than 13 years of age.  Whether Irick was drunk or not, the fact that he sexually penetrated [the victim] is itself sufficient to prove the requisite *mens rea*. Even if Kathy Jeffers's statement could have established Irick's intoxication, it could not have negated his intent to commit aggravated rape, and thus could not have undermined his felony murder conviction.

*Irick v. Bell*, 565 F.3d 315, 322 (6th Cir. 2009)(Court File No. 170, at 7-8) (citations and quotation marks omitted). Consequently, applying the Sixth Circuit's reasoning to the evidence before the Court, Petitioner's alleged intoxication does not undermined his felony murder conviction.

Petitioner now offers, for the first time, the defense of "settled insanity" arguing this suppressed evidence of his intoxication "resulted in settle insanity."  The Sixth Circuit has acknowledged "settled insanity" due to prolonged drug usage is recognized under Tennessee law. *See Pryor v. Rose,* 787 F.2d 592 (Unpublished)(6th Cir. March 20, 1986) *available in* 1986 WL

16603 (offering defense of settled insanity due to prolonged drug usage in rape case did not amount to ineffective assistance of counsel). Respondent acknowledges the defense but argues "settled insanity" is permanent insanity produced by long-continued habits of intoxication, *see Atkins v. State*, 105 S.W. 353, 360 (Tenn. 1907), and Petitioner has failed to provide evidence to establish such a defense.

Although there undoubtedly is evidence Petitioner had mental health issues and had been drinking on the day he committed these crimes, there is not, however, any proof in the record, from which the Court can conclude Petitioner's consumption of alcohol had any permanent effect on his cognitive ability or impaired his sense of judgment. Although it appears Petitioner has engaged in some acts that may be perceived as irrational behavior or poor judgment, isolated acts of irrational behavior or poor judgment are insufficient to show "settled insanity."[14] Indeed, Petitioner has not submitted any evidence of prolonged drug use resulting in "settled insanity." To demonstrate he suffered from "settled insanity" at the time he committed the crime, Petitioner must demonstrate "continuous drunkenness over a long period of time had caused a hibitual [sic] and fixed madness." *Harper v. State*, 334 S.W.2d 933, 936 (Tenn. 1960). Petitioner has made no such showing. Dr. Brown's report reflecting Petitioner's self-report of "steady consumption of marijuana and alcohol" is insufficient to demonstrate "continuous drunkenness over a long period of time had caused a hibiutal [sic] and fixed madness." *Id.* [15]

---

[14] Petitioner has previously submitted affidavits indicating that on one occasion he chased a young girl down the street with a machete and on another occasion he was walking down the hall with the machete in his hand threatening to kill the victim's step-father (Court File No. 129).

[15] During trial Mr. Jeffers testified Petitioner had lived with him for approximately two years and although Petitioner did drink, he never saw him intoxicated or drunk [Addendum No. 3, Vol. 2 of 4, at 617].

Petitioner's claimed period of "settled insanity" apparently occurred only during the time in which he committed the rape and murder. Indeed, the record reflects that, after committing the crime, Petitioner was sufficiently competent and sane to go next door to a neighbor to borrow the phone to summon assistance; dial the step-father's phone number; tell the neighbor it was too late to call an ambulance; and put on his jacket and flee the scene of the crime. Furthermore, there is no evidence Petitioner has suffered any recurring periods of insanity since the commission of the crime or that he has undergone or been prescribed any psychological therapy or mental health treatment or medications for this alleged condition.[16] Thus, it appears that Petitioner's "settled insanity" only manifested itself during the commission of these crimes. Importantly, Petitioner's most recent psychiatric evaluation does not address Petitioner's alleged "settled insanity" nor does Dr. Peter Brown conclude Petitioner was insane at the time he committed the crime (Court File No. 202-1, at 34).[17]

This additional evidence that Petitioner was drinking does not negated his intent to commit rape and does not demonstrate he suffered from "settled insanity." Accordingly, this evidence is not material and habeas relief is **DENIED**.

> b.    *Sentencing*

Petitioner contends the suppression of this evidence prevented defense counsel from

---

[16]    During Petitioner's state post-conviction proceedings, his witness, Dr. Pamela Auble, testified that since his conviction, Petitioner has seen a psychiatrist twice and a psychologist once, but they did not see the need to force him to have treatment and he has adjusted well without treatment (Court File No. 146, at 19)

[17]    Dr. Brown concludes "There is evidence of severe mental illness at the time of the offense and his sanity at the time cannot be established beyond a reasonable doubt." (Court File No. 202-1, at 34)

challenging the District Attorney General's argument during the sentencing phase that "no one has ever said he was intoxicated" (Court File No. 201, at 6). Petitioner maintains this information could have assisted counsel in presenting mitigating evidence during the sentencing phase of his trial to mitigate his sentence from death to life. As Respondent notes, Petitioner knew he had been drinking and he could have presented testimony as to the effect of alcohol through his expert witness regardless of whether Petitioner took the stand.

When addressing Petitioner's claim that the statement by the victim's mother indicating Petitioner was intoxicated before she left for work could have been used during the sentencing phase, the Sixth Circuit observed she had testified that the night of the crime, Petitioner "was really angry and acted like he was wanting to strike out at something, and she had never seen him like that before. . . . The jury heard Kathy testify that Irick had been drinking and was talking to himself before she left for work, and they heard Kenneth testify about the amount of alcohol Irick had purchased that day." (Court File No. 170, p. 8). The Sixth Circuit concluded: "Kathy's statement that Irick was "drunk and talking crazy" would have been, at best cumulative of this other evidence, and we cannot say that the fairness of the penalty phase was undermined by its absence." (Court File No. 170, at 8-9); *Irick v. Bell*, 565 F.3d at 322-23.

Being guided by the Sixth Circuit's analysis and conclusion regarding other evidence referring to Petitioner as drunk, the Court likewise concludes the statements by these young boys, which were, at times, answers to leading questions; the notes referring to Petitioner as drunk when he was left to babysit; and notes referencing an observation of 12-25 beer cans being scattered

about,[18] some looking as though they had been there several days, "would have been, at best, cumulative" based on the testimony presented at trial regarding Petitioner's consumption of alcohol on the date he committed these crimes.[19]

This claim of suppressed evidence does not prove Petitioner was impaired from the consumption of alcohol; rather this evidence shows only that Petitioner consumed alcohol on the day he committed the crimes and not that he was so intoxicated as to mitigate his responsibility for the crimes. And the jury was presented with sufficient evidence to gauge the effect of alcohol on Petitioner's actions. The additional evidence of Petitioner's alcohol consumption does not directly call into question Petitioner's ability to carry out the rape and murder of the victim and it simply would not have significantly strengthened Petitioner's case for mitigation.

Accordingly, because the jury was told Petitioner consumed alcohol prior to committing the

---

[18]     There is no evidence Petitioner drank the beer from these cans. Nevertheless, he would know whether he did and could so advise his counsel.

[19]     Mrs. Kathy Jeffers, the victim's mother, testified Petitioner was talking to himself on the back porch and came into the kitchen drinking from a quart bottle of beer in a paper bag. Petitioner was angry about a fight he had previously had with Mr. Jeffers' mother where she chased him with a broom. Ms. Jeffers left early because Petitioner was "upset, and he had been drinking[,]" and she tried to find her husband to have him return home to watch the children [Addendum No. 3, Vol. 2 of 3, at 540-57]. When asked whether she could tell if Petitioner was intoxicated, Mrs. Jeffers explained that although Petitioner was drinking she notice him being mad more than anything. She testified Petitioner was able to talk coherently and walk around the house without stumbling over furniture or falling [Addendum No. 3, Vol. 2 of 3, at 558-59]. Nevertheless, she was concerned about Petitioner staying with the children that night because he had been drinking and he was very angry [Addendum No. 3, Vol. 2 of 3, at 573].

Mr. Jeffers testified that about noon on the day of the murder, he took Petitioner, who had not previously been drinking, to pick up his last pay check and cash it. Soon thereafter, he took Petitioner to get a quart of beer and they went to see Darrell Easterly. They all went to the victim's house later that afternoon and Petitioner bought another quart of beer [Addendum No. 3, Vol. 2 of 3, at 585-87]. Mr. Jeffers said that while he was with Petitioner on that day, Petitioner only drank the two quarts of beer and did not smoke any marijuana [Addendum No. 3, Vol. 2 of 3, at 595-96].

crimes, the failure to present additional cumulative evidence relating to the *undisputed* fact that Petitioner had consumed a fair quantity of beer does not "put the whole case in such a different light as to undermine [the Court's] confidence in the verdict." *Kyles*, 514 U.S. at 434. Thus, habeas relief is not warranted.

       3.    *Notes Reflecting the Victim was Afraid of Mr. Jeffers and Notes About Petitioner's Past Actions*

Although it is not altogether clear, it appears Petitioner is claiming the information regarding the victim's fear of Mr. Jeffers would have permitted him to try to imply that Mr. Jeffers committed these crimes, and the notes about Petitioner drinking from a commode and his relationship with his sister would have supported an insanity defense or could have been used as mitigating information. Neither party specifically addressed either of these claims in their briefs.

First, there is no evidence before the Court reflecting trial counsel was not aware of this information and that it was actually suppressed. Also, as previously stated, it was Petitioner who was babysitting the victim when the rape and murder occurred; called Mr. Jeffers to tell him the victim had stopped breathing; and stated he could not remember what happened; and, more devastating to his case, it was Petitioner's pubic hair that matched hair found inside the victim. Therefore, because the fact Mr. Jeffers was initially the prime suspect was revealed at trial and because Petitioner has failed to demonstrate how the victim's fear of her step-father would have affected either stage of the trial, this evidence does not undermine the Court's confidence in the verdict of guilt or the sentence in this case and it, therefore, is not material.

As to the note which vaguely referred to his sister and reflected Petitioner drank out of the commode and was kicked out of Sevierville Home because he was found in the girls' room, Petitioner would have had knowledge of his own actions and the information would not have been

in the exclusive control of the State. But, even if this information were suppressed, the Count does not find it to be material as it simply does not undermine the Court's confidence in the verdict and sentence reached by the jury. Accordingly, this issue is without merit and federal habeas relief is not warranted.

**V.     Conclusion**

For the reasons set forth above, Petitioner's claims are without merit, and are **DISMISSED**.

An appropriate order will enter.


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**